UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CALVIN BERNARD JEFFERSON, SR.            CIVIL ACTION

VERSUS            NUMBER: 15-3990

R.D. INGLESE, ET AL.            SECTION: "H"(5)

**ORDER AND REASONS**

This case is before the Court on the consent of the parties pursuant to 28 U.S.C. §636(c). (Rec. doc. 22). Invoking 42 U.S.C. §1983, *pro se* Plaintiff, Calvin Bernard Jefferson, Sr., an inmate of the St. Tammany Parish Jail ("STPJ"), has brought the above-captioned matter *in forma pauperis* ("IFP") (rec. doc. 6) against Defendants, Doctors R. D. Inglese and French of the STPJ. (Rec. doc. 4). Given the official positions that the named Defendants occupy, the following gatekeeping provisions of 28 U.S.C. §1915A are triggered:

> **(a) Screening.** – The Court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
> **(b) Grounds for dismissal.** – On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint –
>      (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
>      (2) seeks monetary relief from a defendant who is immune from such relief.
> **(c) Definition.** – As used in this section, the term "prisoner" means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.

Plaintiff has been allowed to proceed in this matter IFP pursuant to 28 U.S.C. §1915. That statute also authorizes a court to dismiss such a proceeding as frivolous under §1915(e)(2)(B)(i) if the claim alleged therein has no arguable basis in law or fact, *Booker v. Koonce*, 2 F.3d 114 (5th Cir. 1993), or if it fails to state a claim upon which relief can be granted. 28 U.S.C. §1915(e)(2)(B)(ii); *see also* 42 U.S.C. §1997e(c). Giving Plaintiff's complaint the liberal reading to which *pro se* pleadings are entitled, the Court nonetheless finds that this matter should be dismissed as frivolous and for failing to state a claim upon which relief can be granted.

As noted above, Plaintiff is an inmate of STPJ since his arrest for murder on May 8, 2012. In his complaint, Plaintiff alleges that some time around the month of April of 2015, he submitted a sick call request form regarding either a swollen prostate or a hemorrhoid for which he had been treated prior to his incarceration. Plaintiff states that due to a "misunderstanding" with the nurse, half of his medications were discontinued which caused constant pain and discomfort to a well-documented, chronic condition from which he suffers. Upon requesting "better treatment" or a trip to the LSU Clinic, Plaintiff alleges that Dr. French became irate and discontinued his medications entirely, resulting in unbearable pain and a loss of sleep. Plaintiff indicates that he then submitted another sick call request form and was told that he would not see the doctor until September 23, 2015. (Rec. doc. 4, pp. 5-6). Plaintiff seeks an unspecified amount of monetary damages. (*Id.*).

Plaintiff attaches to his complaint a number of forms that were generated at STPJ in the month of July of 2015. (Rec. doc. 4, pp. 8-12). On July 8, 2015, Plaintiff completed an "Inmate Grievance" form in which he explained that he suffered from a well-documented chronic condition that was not being properly handled by the medical staff in that his "…

meds have been discontinued and I have been refused to be seen for nearly 2 wk." (*Id.* at p. 10). Subsequently, on July 13, 2015, Plaintiff completed a "St. Tammany Parish Jail – Request Form," designating his request as "general." (*Id.* at p. 8). Despite instructions on the form which directed that "FOR MEDICAL REQUEST[S] USE A MEDICAL REQUEST FORM," Plaintiff's stated reason for completing and submitting the form was his desire "… to see another doctor, other than Dr. French, to get a second professional medical opinion concerning my injured shoulders and my medicine being discontinued due to a misunderstanding and complaint." (*Id.*). In a space on the bottom of the form designated "Action Taken" is the handwritten notation "[w]ait to see Dr. Gore when he arrives back from vacation on the 22nd day of July 2015. You must re-send … another sick call." (*Id.*).

On July 15, 2015, Plaintiff completed an "Inmate Complaint Form" in which he recalled that Dr. French had discontinued his medication on July 8, 2015 and that on July 13, 2015, he had submitted a form requesting to speak with another doctor to obtain a second opinion. In response to the latter request, Plaintiff reported being told that he would have to wait until July 22, 2015 to see a second doctor, who was on vacation at the time, for another opinion or any additional medical treatment. (Rec. doc. 4, p. 9). Plaintiff further reported that he was in pain and discomfort following the discontinuation of his medication which should not have occurred "… due to a misunderstanding with certain medical staff here at St. Tammany Parish Jail." (*Id.*). On the bottom half of the form appears a handwritten response form Dr. Inglese in which he explained that after reviewing Plaintiff's medical records and speaking with Dr. French, he had determined that Plaintiff's shoulder condition was a non-urgent, chronic problem that could wait one or two weeks for further evaluation. (*Id.*).

3

The final attachment to Plaintiff's complaint is a two-page form from Dr. Inglese dated July 23, 2015 in which he formally responded to the grievance Plaintiff had submitted on July 8, 2015. (Rec. doc. 4, pp. 11-12). There, Dr. Inglese recalled receiving a sick call request form from Plaintiff on July 15, 2015 in which he requested to see Dr. Gore for a second opinion because he disagreed with the care that Dr. French had prescribed. (*Id.*). Upon receipt of that sick call request, Dr. Inglese also recalled having dispatched a nurse to inform Plaintiff that Dr. Gore was on vacation at the time and that further evaluation by him could not take place until he returned and was scheduled to take place that very day. (*Id.*). In Dr. Inglese's opinion, an eight-day delay in honoring Plaintiff's request for a second opinion by Dr. Gore was not unreasonable given the non-emergent nature of his medical problem. (*Id.*). Accordingly, Plaintiff's grievance was deemed to be unfounded. (*Id.*).

On December 11, 2015, the Court issued an order directing that Plaintiff be evaluated by an STPJ physician and that he be provided with such treatment as was reasonably recommended by the doctor. (Rec. doc. 17). A copy of the physician's report detailing the results of the evaluation as well as a copy of Plaintiff's STPJ medical records were thereafter to be provided to the Court and to Plaintiff himself. (*Id.*). The Court has since been furnished with the voluminous records documenting Plaintiff's treatment at STPJ over the years. (Rec. doc. __). A discussion of the medical records pertinent to the resolution of the matter at hand follows.

On January 14, 2015, Plaintiff submitted a sick-call request complaining of pain in both shoulders, the right greater than the left, particularly at night. He thus requested <u>another</u> cortisone shot, heat treatments, or some other modality to lessen his pain. Plaintiff was seen by a nurse that same day who noted that he was then taking Mobic and Ultram for

relief and a follow-up appointment with the doctor was scheduled to take place two days later. Plaintiff was duly seen by Dr. French on January 16, 2015 for his complaints of chronic right shoulder pain, reporting that Mobic provided some relief but that his shoulder was still painful. Plaintiff also reported doing exercises in the form of "modified pushups" and he denied any weakness. Upon physical examination, Plaintiff had a full range of motion and 5/5 strength in the right shoulder but there was some tenderness to palpation over the subacromial bursa. He was also evaluated for scaly lesions over the left axilla. For his chronic right shoulder pain, Plaintiff was prescribed rest, an increase in the dosage of Mobic, and an increase in the frequency of Ultram to twice per day. Dr. French indicated that he would consider an injection to the subacromial bursa although he questioned whether any long-term benefit could be achieved. The treatment records from this date also include a "Consent for Medical Treatment" form that was signed by Plaintiff authorizing an injection of the steroid Kenalog following administration of local anesthesia. Plaintiff subsequently underwent a psychiatric evaluation on January 20, 2015 and was cleared to reside in the general prison population.

On January 23, 2015, Plaintiff completed another sick-call request form complaining of pain before full completion of a bowel movement. Once again, Plaintiff was promptly seen by medical personnel the very same day and it was noted that he was on Metamucil at the time. Plaintiff was seen again by Dr. French for this same condition on January 30, 2015 who noted that his symptoms had begun following an increase in the dosage of Ultram. The assessment was constipation. Plaintiff was continued on Metamucil and the dosage of Ultram was reduced to once per day as Dr. French did not believe that the risks and side effects of taking it twice per day warranted dosing at that level.

Plaintiff was evaluated for needed dental care in March of 2015; received eye care on April 15, 2015; and additional dental care on April 18, 2015. Toradol and Tylenol were prescribed for pain after the latter treatment. He made sick call for evaluation of allergies on May 4, 2015 and his medications at the time included Benadryl, Tramadol, Amlodipine, Konsyl, Lisinopril, and Mobic. Tuberculin testing was administered on May 9, 2015. Plaintiff was seen again by Dr. French on May 20, 2015 for a routine follow-up and medication refills. He reported no new symptoms at the time but was resistant to tapering off his Mobic or Ultram. On physical examination, Plaintiff had normal strength and a full range of motion in the right shoulder. Plaintiff was continued on Mobic and Ultram and was counseled on range of motion exercises. He completed a sick-call request form complaining of dental care that same day and was seen two days later on what was described as a routine assessment. Further dental care was administered on June 13, 2015 and Toradol, Tylenol, and an antibiotic were prescribed.

On June 27, 2015, Plaintiff completed yet another sick-call form in which he requested something else for his shoulder pain and inflammation as the "…Mobic just isn't working like it should." Full range of motion to both shoulders without difficulty was noted. A further follow-up appointment with the jail physician was moved up to July 8, 2015. That evaluation went forward as scheduled, at which Plaintiff reported that Mobic was not effective in addressing his nighttime right shoulder pain even though he was able to exercise during the daytime without issue. He thus "demanded" that the dosage of his Ultram be "<u>doubled</u>." (Emphasis in original). Upon physical examination, Plaintiff had 5/5 strength and a full range of motion in the right shoulder which was free from atrophy and was characterized as "very muscular." Previous x-rays were positive for degenerative joint disease. Dr. French

6

noted that the last time Plaintiff had been prescribed Ultram twice per day it was only a short time before he began taking it three times per day. The doctor further noted that Plaintiff was still able to exercise despite pain and examination results were essentially unchanged over a period of years for a condition that was unresponsive to NSAIDs or steroid injections. Dr. French remarked that Plaintiff was "… simply malingering for Ultram/Neurontin which are NOT appropriate." Accordingly, given the significant potential for abuse, Dr. French discontinued Mobic and Ultram and prescribed Tylenol 650 mg. three times per day. It was apparently that treatment plan that prompted Plaintiff to complete the inmate grievance form dated July 8, 2015 that he attached to his complaint.

It was in the wake of the events of July 8, 2015 that Plaintiff also completed the request and inmate complaint forms that he appended to his complaint. He also completed another sick-call request form on July 22, 2015, as he believed that he was to see Dr. Gore that day. Pursuant to his request for a second opinion, Plaintiff was seen and evaluated by Dr. Gore on July 23, 2015. Medications at the time included Norvasc, Lisinopril, Metamucil, Benadryl, and Tylenol 650. In the doctor's detailed treatment note, he recalled Plaintiff's five-year history of "bursitis" in the shoulders, the right greater than the left, which had been treated with injections and weekly physical therapy. Upon physical examination, Plaintiff's extremities were observed to be muscular with no atrophy in the shoulders or the hands. There was full strength in all muscle groups of the upper extremities with no bony deformity and no warmth or effusion. There was tenderness to palpation of the humerus head/acromial area but a full range of active and passive motion. The assessment included degenerative joint disease of the shoulders, confirmed on previous x-rays, but no inflammation, rotator cuff weakness or pain, no loss of function, and no atrophy. Dr. Gore

agreed with Dr. French's earlier assessment that neither Ultram nor Neurontin were appropriate, only physical exercises and analgesics. Accordingly, a low-dose NSAID coupled with Tylenol was prescribed. A notation at the bottom of the record from this date indicates that Dr. Gore had a "LONG discussion" of the prescribed treatment plan which Plaintiff understood and was satisfied with.

In the next sick-call request form that he completed on July 28, 2015, Plaintiff expressed a desire to be furnished with some alternative type of toothpaste as the "state toothpaste" and Colgate that he had been provided made his teeth hurt and his gums bleed. That request was addressed by a STPJ medical official that day and an appointment with the jail dentist was scheduled. Plaintiff was evaluated by the dentist on August 8, 2015 and was prescribed Toradol to be followed by Ibuprofen with the NSAIDs that Plaintiff was on at the time to be discontinued until after the course of Toradol was complete.

The medical records that have been provided to the Court also contain a "Shakedown Discrepancy Form" which documented the routine search of Plaintiff's cell on August 13, 2015 to assess his compliance with his medication regimen. The results of that search revealed Plaintiff to be in possession of an excess number of doses of Tylenol, Mobic, Naprosyn, Cardura, Norvasc, and, Lisinopril. At the bottom of the form appears a handwritten notation from jail personnel stating that Plaintiff repeatedly complained of needing additional pain medications despite doctors' opinions to the contrary but that the excessive number of doses in his possession constituted evidence that he did not take the pain medications as prescribed. The plan was to discontinue Naprosyn, continue Mobic, and reduce the dosage of Tylenol.

Plaintiff signed his complaint in this case on August 26, 2015.  (Rec. doc. 4, p. 7).  He then underwent various labwork on August 28, 2015, including a comprehensive metabolic panel, routine urinalysis, and PSA screening.  In his next sick-call request form, dated August 29, 2015, Plaintiff asked to speak again with Dr. Gore about being sent to the LSU Clinic for further consultation regarding the bursitis in his shoulders and about changing some of his medications.  That form was given to the nurse by another inmate who recalled that Plaintiff was first prescribed Ultram, then wanted it changed to Mobic, then to Naprosyn, then back to Mobic.  The attending nurse discussed the matter with Plaintiff and a follow-up assessment with the doctor was scheduled for September 23, 2015.  On or about September 12, 2015, Plaintiff made another sick call request for eyeglasses. He was subsequently evaluated and given reading glasses on September 16, 2015.  The following day, he requested a replacement for his "medical blanket" which had been lost during the course of a shakedown.  The issuance of a cotton blanket was authorized by Dr. Inglese.  In a second sick-call request form that he completed on September 17, 2015, Plaintiff asked to see the dentist about a possible tooth extraction.  An evaluation was conducted the following day and no further action was deemed to be necessary at the time.  Plaintiff received the cotton blanket on September 18, 2015.

Further dental care was provided to Plaintiff on September 26, 2015 including prescription medications in the form of Toradol and Motrin.  On September 30, 2015, Plaintiff asked that his high blood pressure medication be discontinued.  Pursuant to that request, Plaintiff was seen again by Dr. Gore the following day.  Upon physical examination, Plaintiff's shoulders were described as muscular with no atrophy and he had a full range of motion with no crepitus.  Strength was 5/5 in all muscle groups, including the rotator cuff,

but there was tenderness to firm testing of the rotator cuff with no give-way and tenderness to the AC joint/humeral head area.  The assessment was rotator cuff tendonitis versus subacromial bursitis.  As it was reported that all analgesics used to date were ineffective but that there was no weakness of the rotator cuff structure, a different NSAID was to be tried but narcotics and Neurontin were not indicated for Plaintiff's condition.  Plaintiff was also to continue physical therapy exercises and the benefit of a further joint injection was to be discussed with Dr. French.  The treatment plan also addressed Plaintiff's other physical ailments.

On October 18, 2015, Plaintiff submitted yet another sick-call request form in which he challenged the diagnosis and treatment for a skin condition to his shin which had been ongoing for two years.  Bloodwork was performed on October 21, 2015, including a lipid panel with LDL/HDL ratio.  Pursuant to Plaintiff's request of the same day, he was seen for flu-like symptoms on October 27, 2015 and was prescribed CTM, an antihistamine.  Acting on a report from another inmate, Plaintiff was evaluated and monitored for suspected suicidal thoughts from November 12 to 16, 2015 and was released back to the general population with a diagnosis of anxiety (not otherwise specified), legal problems, and rule out drug-seeking behavior as Plaintiff had made a specific request for Wellbutrin.  Further CTM was prescribed on November 22, 2015 in response to Plaintiff's complaint of continued flu-like symptoms.

Plaintiff was seen at the STPJ Psychiatry Clinic for symptoms of depression on December 8, 2015 and was prescribed a three-month supply of Paxil.  Orajel was provided to Plaintiff on December 24, 2015 to relieve dental pain.  Plaintiff was subsequently evaluated for an episode of intermittent chest pain on January 1, 2016 but he had no

shortness of breath, palpitations, or other symptoms and his blood pressure was 137/87. The possibility of manipulation was noted. The following day, another random shakedown of Plaintiff's cell was conducted and he was found to be in possession of less Paxil, Benadryl, and Norvasc than he had been prescribed but more Flomax, Ibuprofen, and Ultram than he was authorized to possess.

On January 4, 2016, Plaintiff was re-evaluated by Dr. Gore for his shoulder and other physical issues. Plaintiff reported that his shoulder condition was the same although he acknowledged that Indocin did "tone it down." His symptoms were better during the day when he was able to shower but were aggravated by certain activities. Plaintiff reportedly did strength and range of motion exercises regularly but only infrequent strengthening exercises secondary to pain. Upon physical examination, Plaintiff's extremities were observed to be muscular with no atrophy and sensation was normal to light touch. He had a full range of shoulder motion with no weakness, including the rotator cuff, and there was no tenderness to palpation which was viewed as a positive development. The assessment included chronic degenerative joint disease versus rotator cuff impingement with no weakness or atrophy and no neuropathic symptoms or findings. Plaintiff was counseled further on range of motion, stretching, and strengthening exercises and seemed to have experienced some improvement. Indocin was felt to be the most effective NSAID Plaintiff had been prescribed and "as needed" use of that medication in conjunction with exercises was discussed to achieve maximum relief. Dr. Gore did not believe that the benefits of steroid injections outweighed the dangers and neither Ultram nor Neurontin were felt to be appropriate, although Plaintiff was not demanding them that day as he had in the past. Plaintiff seemed to understand and appreciate the pathophysiology of his shoulder condition

and the treatment plan that was put into place. Dr. Gore authorized a 180-day refill on some nine different medications that Plaintiff was taking and his blood pressure was to be monitored every week for four weeks. A follow-up appointment for his hypertension was to take place in four to six weeks and Plaintiff's shoulders and other physical issues were to be re-evaluated in three to four months.

Plaintiff's Paxil was discontinued on January 6, 2016 but was reinstituted one week later following consultation with the prison psychiatrist, Dr. Bhatt. The doctor cited the results of the recent shakedown as evidence that Plaintiff was not taking his medications as prescribed and that he had a strong history of manipulative behavior. After obtaining Plaintiff's assurance to take his medication as prescribed, Dr. Bhatt decided to give Plaintiff one more chance and restarted him on Paxil.

In the meantime, Plaintiff had been treated for a spike in his blood pressure on January 11, 2016 after eating a salt packet. Plaintiff was seen in the medical department again on January 23, 2016 after learning of some family-related issues and was placed on suicide watch as a precaution. Yet another shakedown of Plaintiff's cell occurred on January 24, 2016 and there were variances, either excesses or deficits, of all eight medications that had been prescribed, with Plaintiff possessing approximately 50 more pills than he should have. As a result, six of the medications were ordered discontinued. Plaintiff received a psychiatric evaluation later that day and was removed from suicide watch on January 25, 2016. Further psychiatric monitoring occurred on January 28, February 2, and February 4, 2016. Plaintiff declined a nurse assessment on February 6, 2016 but he was counseled by a social worker on February 23, 2016. The final medical records that have been provided to the Court document another psychiatric evaluation on February 26, 2016. Plaintiff was

asymptomatic at the time and was thus cleared to remain housed in the general prison population.

It is against the backdrop of the foregoing medical and prison records, records upon which the Court may properly rely, *Gobert v. Caldwell*, 463 F.3d 339, 346 n. 24 (5th Cir. 2006), that the sufficiency of the allegations made by Plaintiff against the named Defendants be analyzed.[1/] In order to establish a constitutional violation, Plaintiff must demonstrate that the Defendants were deliberately indifferent to his serious medical needs which constituted an unnecessary and wanton infliction of pain.[2/] *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323 (1991). Deliberate indifference is an "extremely high" standard to meet, *Gobert*, 463 F.3d at 346, one that has been equated with "subjective recklessness" as that term is used in criminal law. *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997). A prison official shows deliberate indifference if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994).

"Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346 (footnote omitted). If an inmate in fact receives medical treatment, federal constitutional protections are not violated simply because that treatment was unsuccessful or because pain persists despite

---

[1/] "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995).
[2/] This standard is the same for both pre-trial detainees and convicted prisoners. *Hale v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996).

13

the treatment. *Gobert*, 463 F.3d at 345; *Williams v. Chief of Medical Operations, Forrest County Jail*, No. 94-10115, 1994 WL 733493 at *2 (5th Cir. Dec. 27, 1994); *Kron v. Tanner*, No. 10-CV-0518, 2010 WL 3199854 at *7 (E.D. La. May 19, 2010), *adopted*, 2010 WL 3171040 (E.D. La. Aug. 6, 2010). That an inmate's medical care "… may not have been the best money could buy" is insufficient to establish a constitutional violation, *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992), and the failure to provide a doctor in the field of an inmate's choosing does not, in and of itself, state a claim of deliberate indifference. *Green v. McKaskle*, 788 F.2d 1116, 1127 (5th Cir. 1986). And where a §1983 claim is premised on a delay in the provision of medical care, a prisoner must also establish that he suffered substantial harm as a result of the delay. *Richard v. Martin*, 390 Fed.Appx. 323, 325 (5th Cir. 2010). "Experiencing 'occasional delays in obtaining' medical treatment is insufficient to prove a refusal of providing medical care when the inmate's … medical records demonstrate that he received treatment." *Taylor v. Bexar County*, No. 10-CV-0045, 2011 WL 759459 at *4 (W.D. Tex. Feb. 23, 2011)(quoting *Gobert*, 463 F.3d at 346); *Richard*, 390 Fed.Appx. at 324-25.

As respects the two specifically named Defendants, the medical and other prison records that are presently before the Court fall far short of establishing the objective and subjective components needed to prevail on a claim of deliberate indifference. In his complaint, Plaintiff first alleged that half of his medications were initially discontinued due to a "misunderstanding" with the nurse. Plaintiff does not specifically attribute this action to either of the named Defendants and the unidentified nurse is not named as a defendant. Be that as it may, a review of Plaintiff's medical records reveals that the dosage of Ultram that he had been prescribed was reduced one half by Dr. French not as a result of deliberate indifference but in an attempt to alleviate the symptoms of constipation that Plaintiff was

experiencing. Plaintiff then alleges that upon requesting "better treatment" or a trip to the LSU Clinic, Dr. French became irate and discontinued his medications entirely. A prisoner, however, is not entitled to medical treatment of his choosing simply upon request, *Stafford v. Kelly*, No. 09-CV-0133, 2011 WL 2633034 at *2 (N.D. Miss. June 3, 2011), *adopted*, 2011 WL 2633174 (N.D. Miss. July 5, 2011), nor is he entitled to see a particular practitioner of his liking. *Green*, 788 F.2d at 1127. The contemporaneous medical records confirm that in response to Plaintiff's sick call complaint that Mobic was not effective in alleviating his pain, his next regularly-scheduled evaluation by the doctor was expedited to July 8, 2015, so that Plaintiff's concerns could be addressed sooner. It was at that evaluation that Plaintiff demanded that the dosage of his Ultram be doubled. Based on the largely unremarkable results of a physical examination, Plaintiff's history of medication use, and the significant potential for abuse, Dr. French opined that Plaintiff was malingering and discontinued his Mobic and Ultram, substituting quantities of Tylenol in their stead. As aptly noted by the Fifth Circuit, "[a] medical doctor is entitled – obliged, even – to change a patient's prescription in response to suspected misuse, addiction, or abuse. Doing so is not deliberate indifference." *Brauner v. Coody*, 793 F.3d 493, 499 (5th Cir. 2015). And contrary to Plaintiff's allegations, Dr. French did not discontinue his medications entirely but simply substituted over-the-counter pain medication for prescription medications, a classic example of a matter of medical judgment. *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 107, 97 S.Ct. 285, 293 (1976)).

Finally, Plaintiff complains that in response to another sick-call form in which he requested to be seen by a doctor other than Dr. French, he was told that he would have to wait until Dr. Gore returned from vacation before that request could be honored.

Notwithstanding the fact that a prisoner is not entitled to medical treatment of his choosing, *Stafford*, 2011 WL 2633034 at *2, his disagreement with the type or timing of medical services provided cannot support a §1983 claim. *Desroche v. Strain*, 507 F.Supp.2d 571, 583 (E.D. La. 2007)(citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993)). While awaiting a second opinion from Dr. Gore, Plaintiff's condition was duly monitored by Dr. Inglese who concluded that the eight-day delay in honoring his request was not unreasonable given the non-emergent and chronic nature of Plaintiff's shoulder condition. As much was confirmed in Dr. Gore's detailed treatment note of July 23, 2015 and, in any event, no substantial harm is shown as a result of any delay. *Richard*, 390 Fed.Appx. at 325.

The copious medical records that have been provided to the Court belie any credible claim of deliberate indifference on the part of the named Defendants. Indeed, the records underscore that Plaintiff's allegations "… address the nature of his treatment and not the lack thereof." *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). As observed by the Fifth Circuit, "[c]ontinuing … pain is unpleasant. Its existence does not, however, in and of itself demonstrate that a constitutional violation occurred." *Mayweather*, 958 F.2d at 91. In short, the determinative issue here is not whether the medical care that Plaintiff received was substandard in some respect, whether his medical problems or pain persisted, or whether he was dissatisfied with his care; rather, it is only whether his serious medical needs were met with deliberate indifference <u>by the named Defendants</u>. Based upon a review of the record that is presently before it, the Court easily answers that question in the negative. Accordingly, Plaintiff's suit is dismissed with prejudice pursuant to 28 U.S.C. §1915(e)(2)(B)(i) and (ii). Judgment will be entered to that effect.

New Orleans, Louisiana, this __18th__ day of _____April_____, 2016.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE